The court will now call Case No. 5-14-0553, deposing Keane. Counsel for the appellant, you may proceed. May it please the Court, Counsel. Assistant Appellate Defender Eun Sun Nam on behalf of Charles Keane. This is a direct appeal following a jury trial where Mr. Keane was convicted of residential burglary and sentenced to 20 years imprisonment. There are three issues on appeal, but the main focus today will be on the first issue with reference to the second and third issues. This is a case that turns on whether the evidence is closely balanced. To begin, the State concedes that the trial court erred during its Rule 431 be their admonishments to the veneer. The trial court's specific errors are laid out in detail in the opening brief on pages 15-18 and in the appendix, Appendix A. However, it's notable here that the trial court's errors included failing to ask a majority of the jury if they accepted the principle that the State had the burden to prove beyond a reasonable doubt, or if they accepted that Mr. Keane did not have to present any evidence or testify. Because the State concedes error, that the trial court erred in failing to comply with Supreme Court Rule 431-B under plain error, the only point of contention is whether this case is closely balanced. This means that when considering the totality of the circumstances, the qualitative, as opposed to strictly the quantitative evidence, Mr. Keane's case was so closely balanced that the trial court's their admonishment error alone threatened to tip the scales of justice against Mr. Keane. Here the evidence was closely balanced for two reasons. One is intent. Two is identification. In the present case, to prove Mr. Keane guilty beyond a reasonable doubt of residential burglary, the State had to prove the following. That Mr. Keane, knowingly and without authority, entered Jesse Worden's dwelling or the Yoga House with the intent to commit a theft therein. Addressing first that the evidence was closely balanced regarding the intent. The State had to prove intent here circumstantially. That meant the State had to present evidence of the time, place, the manner of entry into the Yoga House, of the stranger's activity within the Yoga House, or any other alternative explanations for his presence. So first, the evidence was presented that the Yoga House was a place that was open to the public for meditation and yoga. There's no evidence presented that Okay, I'm trying to get this straight. So, this was a private residence, and it was also, parts of it were open to the public? Yes. So, Jesse Worden, the complainant here, testified that this was his residence, but it was also known as the Yoga House in Carbondale, Illinois, and it was open to the public for meditation and yoga. I think the specific members met on Sunday evenings, but he did not testify that other times the Yoga House was closed to the public. But the problem was that this was his bedroom the guy drove the plane on. And that's not open to the public, is it? At any time? That's true, Your Honor. Except for the fact here, there were signs, as soon as you enter the Yoga House, there were signs that said, you know, to the left is the meditation area, to the right there was a residence area. But there was no signs that, you know, one part was closed to the public or anything like that. And there was no evidence that the front door was broken into, or that windows were broken into. There were no burglary tools that were found that were left behind by the stranger. And when Mr. Keene was actually arrested by the Carbondale police, they didn't find any burglary tools on him. Your Honor, you don't need burglary tools, you know, per se, but here we're talking about intent. So Mr. Keene had to have the intent before he went into the house. So this house that's open to the public, there's no evidence of a break-in whatsoever, which means, you know, kind of the stranger opened the front door, went in, and found that no one was in the meditation room. So that's kind of how he went through the house. So he went to the meditation room, the state's alleging that he grabbed some coins from the meditation room, that and then he went to the residence area, and then walked upstairs, and there's the allegation that he moved a PlayStation 3 from one of the residence bedrooms down to the living room. So the burglary tools itself doesn't mean much here, except when you look at the totality of the evidence regarding the intent, not having burglary tools, and not having the windows, you know, bashed in or the front door kicked in, that goes to his intent before he went into the house. Further, the complainant, Jesse Worden, he testified that he didn't see the stranger taking the coins from the fishbowl or moving the PlayStation 3 within the residence section. So as I said, it kind of seems like the stranger went to the meditation area, found no one was there, took the coins, and then moved to the residence area. And as noted in the briefs, there's two ways to charge residential burglary, and the state could have charged Mr. Key with knowingly and without authority remaining within the dwelling place of Worden or the yoga house with the intent to commit a theft therein. But here the state did not. The state charged it as Mr. Key knowingly and without authority entered the yoga house with the intent to commit a theft therein. So the point here is that the evidence is closely balanced regarding the intent, because he had to have this evidence in that front door before he went into the yoga house. And once again, let's see, so in other words, what I'm trying to say is that the state is precluded here from relying on the intent formed after the fact. So this intent had to be before, and that's where the evidence is closely balanced in regards to the intent aspect. The second aspect is that the evidence is closely balanced as to the identification of Mr. Key. And this is kind of where I'll address arguments two and three from the briefs. Under the totality of the circumstances, one fact to consider is the behavior of the jury. And while the mere fact that a jury sent a note to the court or the judge does not mean by itself that the jury breached an impasse or that the jurors themselves consider this a closely balanced case, except the jurors' notes here are very significant. And this is where the case closely resembles People v. Mueller. So it's the same judge, the same issue with the problems is there, and both juries sent notes to the trial court. Here, specifically, the juries ask the question that goes to the matter of identification. Well, Mueller was about identification of him dependent on video. And the jury wanted to see video. That's true, Your Honor. But not identically, but similarly here, the jury asked were there fingerprints on the fishbowl? What happened to the fishbowl? And the two ways that the state ties Mr. Key to the Yoga House is through fingerprinting, is through the PlayStation 3, and is through the fishbowl, where the coins were taken from. So the questions here do go towards this idea here that the evidence is closely balanced in regards to identification. It was a partial fingerprint, wasn't it? It was a partial fingerprint, yes, Your Honor. That was from the PlayStation 3. That was where? The PlayStation 3 gaming system. Yes, that was moved within the residence. Which was missing out of a room. That was the testimony, yes, Your Honor. And was in a different location. So, Your Honor, you're correct. So the testimony was that the PlayStation 3 was moved from a residence bedroom to the living room. So that's Jaron Singh's bedroom. But the main complainant in this case is Jesse Worden. And Jesse Worden is the only resident that testified at trial. But they did show the fingerprint was on something that, of course, he denied it was even him that was there. He was there. That's true. The defense theory is that this was a misidentification. And that's why... He was running down the stairs, and he saw him from the back, and he identified his clothing. I guess he never saw his face. I don't know. Well, the testimony was that Worden said he got a good look at the guy. I thought the testimony was that he did see him in his bedroom. That's right. And that he got a good look. Except for the fact that he couldn't give any descriptions of his face. That Mr. Keene was a lighter skinned black male. That he was 49 years older, like older gentleman. That he had a facial goatee, and he couldn't give any of those descriptions. Did he also testify that he could see him as he was leaving the residence, as he was looking back at him? That's correct. So what happens is Worden testified that he chased the stranger out of his bedroom. And this is a stranger that he never met before and that he did not know. He chases him out of the bedroom, and he chases him down the stairs. And the guy looked back. He's going down. Can you repeat that? Did he look back when he was running down the stairs? Worden's testimony was yes, that he was looking back. We've taken up a lot of your time. You can take your call. Well, so the other argument here is that identification is also closely balanced due to arguments two and three, which relate to the fingerprinting evidence from O'Daniel, which was the fingerprinting expert. And Worden's testimony, which was an unreliable, suggestive one man show up. Did he have a lot of change in his car? Yes, Your Honor. So there was about five dollars and thirty cents of change in his pocket. A whole bunch of quarters or something like that? So the record does contain the exact number of quarters, dimes, and nickels, but there was a lot of change in a dollar bill. You will have an opportunity to rebut. Thank you. Delta, Florida State? Thank you. May the police support counsel Chelsea Kasten on behalf of the state. Your Honors, this is a really unfortunate case for the defendant because he chose to burglarize a home where the resident was in his house, watched the gentleman walk into his room, talked with him, watched him scope out his belongings, and then chased him out of his home and looking at the evidence that was presented at the trial, there was a Playstation 3, this was a two story home, as Your Honor noted, the bedrooms were upstairs, and there is a room that they used for yoga once a week, although that was for a limited purpose, not at the time when this burglary occurred. But the state has confessed error on their 431B issue. So the question before the court is whether the evidence is spoken out. So would you address the arguments of the defense as to what evidence there was of intent? Yes, Your Honor, absolutely. First of all, you're not going to have someone enter a private residence who has never been there before, who wasn't welcome, who goes into someone's bedroom and takes out a Playstation 3, takes it downstairs into the main room and leaves it by the front door, then goes back upstairs into another bedroom where he encountered Mr. Worden, who was the individual who lived at the home at the time. Whether or not the state met its burden to prove the residential burglary really goes to a question for the jury. However, in this case, Your Honor, the evidence was not closely balanced. Keeping in mind that the Illinois Supreme Court did just release People v. Sebi, it's not officially finalized. However, the new standard is that the inquiry is not regarding the sufficiency of close evidence, but rather the closeness of sufficient evidence. So, keeping in mind that the court's not going to re-weigh the evidence or substitute its judgment for the trier of fact, in this case, Your Honor, we had an eyewitness account where Mr. Worden had a stranger open up his bedroom, come into the room, look at his belongings. Understandably, Mr. Worden got upset, started yelling at him to get out of the house, and chased him down the stairs where he saw the individual's face. He did testify to that fact. In total, he said he saw him for probably about two minutes. Started to chase him down the street, realized he didn't have his phone to call the police, goes back to get his phone, and starts to pursue the individual again. Eventually loses sight of him, so he goes back into the house, which is when he notices the fishbowl, where all the coins are missing. There's also a sign that goes by the fishbowl about donations that had been knocked over, showing that someone had disturbed it. And then there was a fingerprint that was lifted off of the PlayStation 3 that was supposed to be upstairs in a roommate's bedroom, but had been moved down to a chair. So, we had the eyewitness testimony, both for the show-up, when Mr. Warden confirmed that that was the individual who had been in the home, and then again at trial when he identified him, again, as the individual who had been in the home. And then we had the expert testimony, which was accepted by the court with no objection by the defense counsel, which confirmed that the fingerprint did belong to the defendant in this case. And as Your Honor noted, when they searched him incident to arrest, they found a massive amount of change in his pocket. He didn't have a consecutive story about why he was in the area. He gave them mixed stories about what he was doing in the area. And all of this, ultimately, went to the jury for them to deliberate, and they determined that he was guilty of residential burglary. How long was it between the time of the burglary and the time that he was arrested? Your Honor, I believe it was about an hour total. And the defendant, not the defendant, Mr. Warden testified that while it was getting darker, he could still see perfectly. He could make out the defendant individual. And in addressing the description that Mr. Warden gave the police when he called them to report the burglary, it was a sufficient description for someone who's pursuing someone down a street who had just been in his home. In particular, specifying something like he was wearing a black beret, kind of a particular item of clothing for an individual to be wearing, which was sufficient for the police to detain the defendant and then conduct a show up for Mr. Warden to see if they had the right person or if they needed to keep looking to ensure that the area was safe. And if my recollection is correct, he was apprehended on Cherry Street. Is that correct? I believe so, Your Honor. And how far, do you know how far that falls from the residence? I do not, Your Honor. I know it was in the area. It was considered in the area. What does that mean? I wish I knew, Your Honor. I'm not really sure how the police determine what an area is, but it was determined to be in the area, and that's where he was apprehended. In terms of the note that the jury sent out about the fishbowl, Your Honors, the note from the jury just shows proper consideration of all of the evidence. There was a print on the PlayStation 3, so it's very logical when going through the evidence that a jury would say, okay, but was there a print on the fishbowl? If anything, it actually goes against the state, rather than shows somehow that it was unfair to the defendant. However, the expert had already testified that with some surfaces, it's possible to not leave fingerprints. And so there was, and they had the fingerprint on the PlayStation 3, and then they had the maximum amount of change in his pocket. So there's not a lot of significance in the note, if anything. It only shows that they were properly considering the full weight of the evidence. In terms of 431B admonishments, Your Honor, they were admonished before they were sent back to deliberate that the defendant is considered innocent until proven guilty. You can find all of his admonishments before they went back around 337 of the transcript. Just if you were wondering. Okay. Does the court have any more questions in terms of... Okay. Just for quick reference, Your Honor, Actually, no. We would just ask that you please affirm the ruling of the trial court. In this case, they did not give a perfect 431B admonishment. However, the evidence was so heavily weighed in favor of the state showing the guilt of the defendant that the sufficiency of the evidence is obvious. It was an easy decision for the jury, and we would just ask that you affirm. Thank you. At this point, you may reply. Your Honor, I would just like to make three points. It is true. The evidence must be closely balanced to evidence that actually matters. Here, the intent of the defendant matters. The identification of the defendant matters. And those are the issues that are in question in the briefs. So counsel talked about Mr. Keene being found on Cherry Street. In the opening brief, there's an Appendix B with Google Maps that kind of go through the different points of interest. It was a few blocks, but there's an explanation for his presence in the area. If you remember, the defense presented evidence that his brothers live on opposite corners of this Carbondale area, and that Mr. Keene frequented both brothers' homes. He walked between it very frequently. So that was kind of the reason that Mr. Keene was there. He was also drinking that morning with his uncle, and his uncle dropped him off in that area. So his presence being there was explained to a certain extent. I thought there was some kind of evidence about him going to the liquor store, or coming from the liquor store? So there was both, Your Honor. The uncle presented a testimony that he went with Mr. Keene that morning, grabbed a drink. Mr. Keene bought the drinks that morning, and that's why he had money on him. And then afterwards, the uncle dropped him off in this vicinity, and all the points of interest are in the Appendix. So here, the state says that the evidence is overwhelming because of the fingerprint evidence, and because of the show of evidence. But the show of evidence is where Worden testified that it was kind of dark outside. And another officer, Officer Chloe Frank, testified that it was fairly dark outside. It was dusk. It was 7 o'clock in October. So that was the testimony about the lighting. And when Mr., when Worden actually made the identification, he was 10 feet away where two police officers were surrounding Mr. Keene. They were searching him, and Officer Chloe Frank, who had driven him to kind of do a drive-by identification, told him, you know, we have a suspect that we want you to look at. Or something like, we have someone that matches the description you gave. How much of the article of clothing did he describe? Was it the shirt, or the coat, or the jacket, or whatever it was? It was the black hat, white top or hoodie, and then the black pants and a black mail. And that's what the guy had on? Well, yes, Your Honor. Did he have a goatee? Sorry, Your Honor? Was the goatee description accurate? The goatee description was accurate. If you look in the exhibits, there's an exhibit of Mr. Keene that was taken at the station on the day he was arrested, and the goatee is very prominent. But that also goes to Worden's testimony, that he was really alarmed, he was shocked, and it's understandable. Someone... ... ... ... ... Well, as explained earlier, the description that Worden gave was very generic. So it's just the black man in Carbondale who's wearing a white shirt, black pants, has a black hat. The black hat has a detailed clothing description, complexion, and description of his facial hair. Right. So the facial hair was not a part of Worden's description. The complexion was not a part of Worden's description. It was just the clothes. So how long after the incident was the showdown? It's not exact, but Worden testified that it was around 5.30pm when he went into his room, and then the stranger opened his door, and by the time that the show up happened, it was 7 o'clock or somewhere around that range. Was there any equivocation about the level of certainty at the confirmation? So that's unknown, Your Honor. So at trial, Worden says that there was no doubt in his mind. But at the time of the incident, and Officer Frank would have been able to testify to that, but there was no testimony that at the time of the incident, he was clear. He does say, or Officer Frank did testify that Worden was able to pick out Mr. Keene from the show up. But there wasn't any, I'm 100% accurate, or there's no doubt in my mind at the time of the show up. Thank you, Counsel. We'll take a matter under indictment.